McGEE, Chief Judge.
 

 Zackery Ray Proffitt ("Plaintiff") appeals from the trial court's order granting summary judgment in favor of James Kelly Gosnell ("Defendant"). For the reasons discussed below, we affirm.
 

 I.
 
 Background
 

 Plaintiff was driving a truck east on Bear Creek Road, near Asheville, shortly before 6:00 p.m. on 16 October 2015. Plaintiff's father, Manon Proffitt ("Plaintiff's father"), was a passenger in the truck. About a quarter mile from their home, Plaintiff and Plaintiff's father observed a fallen tree obstructing both lanes of traffic in the road ahead. The tree's vertical branches held its trunk approximately five feet above the surface of the road. Plaintiff's father told Plaintiff to slow down, and Plaintiff pulled off the road and stopped the truck thirty or forty feet from the tree. Plaintiff's father turned on the truck's hazard lights and called Plaintiff's mother to ask that she bring down a chainsaw so he could cut up the tree and remove it from the road. Plaintiff's father instructed Plaintiff "to get across the tree and try to wave traffic down, slow [cars] down, [while] waiting on his mom to get there [with the chainsaw]." Plaintiff climbed on the tree. After noticing he was getting pine sap on his hands, Plaintiff asked his father for a pair of gloves.
 

 *203
 
 While Plaintiff's father searched for gloves for Plaintiff, Plaintiff stood on top of the tree. According to Plaintiff's father, shortly after Plaintiff climbed onto the tree, they heard an oncoming vehicle approaching an uphill curve in the road ahead. Plaintiff began waving his arms at the approaching vehicle and yelling in an attempt to get the driver's attention. Plaintiff's father testified that Plaintiff "never got down" from the tree; had been "goofing off" while standing on the tree; and was "just being a teenager [,] ... [b]ecause [he] thought [the other driver] was going to stop." Plaintiff's father said he told Plaintiff to jump down from the tree, and Plaintiff turned to jump, but Plaintiff's pants snagged on a tree limb.
 

 Defendant was driving a truck on Bear Creek Road coming from the opposite direction around 6:00 p.m. on 16 October 2015. Defendant testified that as he approached the curve in the road, the sunlight hit his windshield, creating a glare. Defendant stated he "took [his] foot off the gas, moved it towards the brake[,]" and reached up for his sun visor. Defendant was driving forty-five miles per hour, five miles per hour over the posted speed limit. Defendant testified that, as he moved his foot toward the brake to slow down, he noticed something in the corner of his windshield. Defendant alleged he did not realize there was a tree in the road, or see Plaintiff, before colliding with the fallen tree.
 

 On impact, one of the tree's branches struck Plaintiff in the back of the head, propelling Plaintiff through the air and into the roadway, where he landed on his back. Plaintiff was unconscious, barely breathing, and bleeding from his ears. He was airlifted to Mission Hospital, where he was treated for injuries that included skull fractures and swelling of the brain. At a deposition in June 2016, Plaintiff indicated he had no recollection of the several days preceding the 16 October 2015 collision, the collision itself, or the days he spent in the hospital thereafter.
 

 Plaintiff filed a complaint on 22 December 2015 alleging he was seriously injured as a result of Defendant's negligence.
 
 [1]
 
 In response, Defendant asserted numerous affirmative defenses, including contributory negligence. Defendant filed a motion for summary judgment on 5 October 2016. Following a hearing on 24 October 2016, the trial court entered an order on 10 November 2016 finding that Defendant was entitled to summary judgment as a matter of law. Plaintiff appeals.
 

 II.
 
 Standard of Review
 

 This Court "review[s] a trial court's order granting or denying summary judgment
 
 de novo
 
 . Under a
 
 de novo
 
 review, the [reviewing] court considers the matter anew and freely substitutes its own judgment for that of the lower [court]."
 
 Blackmon v. Tri-Arc Food Systems, Inc.
 
 , --- N.C. App. ----, ----,
 
 782 S.E.2d 741
 
 , 743 (2016) (citation and quotation marks omitted).
 

 Summary judgment is appropriately entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law."
 
 See
 
 N.C. Gen. Stat. § 1A-1, Rule 56(c) (2015). The party moving for summary judgment bears the burden of showing that no triable issue of fact exists, and may satisfy its burden "by proving: (1) that an essential element of the non-moving party's claim is nonexistent; (2) that discovery indicates the non-moving party cannot produce evidence to support an essential element of his claim; or (3) that an affirmative defense would bar the [non-moving party's] claim."
 
 CIM Ins. Corp. v. Cascade Auto Glass, Inc.
 
 ,
 
 190 N.C. App. 808
 
 , 811,
 
 660 S.E.2d 907
 
 , 909 (2008) (citation omitted). "[I]n ruling on a motion for summary judgment[,] the [trial] court does not resolve issues of fact and must deny the motion if there is any issue of genuine material fact."
 
 Singleton v. Stewart
 
 ,
 
 280 N.C. 460
 
 , 464,
 
 186 S.E.2d 400
 
 , 403 (1972) (citation omitted).
 

 This Court reviews the record "in a light most favorable to the party against
 
 *204
 
 whom the order has been entered to determine whether there exists a genuine issue as to any material fact."
 
 Smith v. Harris
 
 ,
 
 181 N.C. App. 585
 
 , 587,
 
 640 S.E.2d 436
 
 , 438 (2007) (citation and quotation marks omitted). "If the trial court grants summary judgment, the decision should be affirmed on appeal if there is any ground to support the decision."
 
 Nifong v. C.C. Mangum, Inc.
 
 ,
 
 121 N.C. App. 767
 
 , 768,
 
 468 S.E.2d 463
 
 , 465 (1996) (citation omitted).
 

 While this Court has cautioned that summary judgment "is rarely an appropriate remedy in cases of negligence or contributory negligence[,]" we have clarified that "summary judgment is appropriate in a cause of action for negligence where the [plaintiff's] forecast of evidence fails to show negligence on [the] defendant's part, or establishes [the] plaintiff's contributory negligence as a matter of law."
 
 Blackmon
 
 , --- N.C. App. at ----,
 
 782 S.E.2d at 744
 
 (citation, quotation marks, and internal quotation marks omitted).
 

 III.
 
 Defendant's Motion for Summary Judgment
 

 Plaintiff argues summary judgment was improper in the present case because he was not contributorily negligent as a matter of law. He further contends that, even assuming Plaintiff was negligent, Defendant had the last clear chance to avoid the collision that resulted in Plaintiff's injuries. We address each argument in turn.
 

 A.
 
 Contributory Negligence
 

 "Contributory negligence is negligence on the part of the plaintiff which joins, simultaneously or successively, with the negligence of the defendant alleged in the complaint to produce the injury of which the plaintiff complains."
 
 Meinck v. City of Gastonia
 
 , --- N.C. App. ----, ----,
 
 798 S.E.2d 417
 
 , 423 (2017) (citation and internal quotation marks omitted). "In order to prove contributory negligence on the part of a plaintiff, the defendant must demonstrate: (1) [a] want of due care on the part of the plaintiff; and (2) a proximate connection between the plaintiff's negligence and the injury."
 
 Daisy v. Yost
 
 , --- N.C. App. ----, ----,
 
 794 S.E.2d 364
 
 , 366 (2016) (citation and internal quotation marks omitted) (alteration in original). However, a plaintiff "may relieve the defendant of the burden of showing contributory negligence when it appears from [the plaintiff's] own evidence that he was contributorily negligent."
 
 Price v. Miller
 
 ,
 
 271 N.C. 690
 
 , 694,
 
 157 S.E.2d 347
 
 , 350 (1967) (citation and quotation marks omitted).
 

 This Court has held that
 

 [a p]laintiff cannot recover if she, too, was negligent where that negligence was a proximate cause of her injuries. [C]ontributory negligence consists of conduct which fails to conform to an
 
 objective
 
 standard of behavior-the care an ordinarily prudent person would exercise under the same or similar circumstances to avoid injury. The existence of contributory negligence is ordinarily a question for the jury; such an issue is rarely appropriate for summary judgment, and only where the evidence establishes a plaintiff's negligence so clearly that no other reasonable conclusion may be reached. Contradictions or discrepancies in the evidence even when arising from [the] plaintiff's evidence must be resolved by the jury rather than the trial judge.
 

 Cone v. Watson
 
 ,
 
 224 N.C. App. 241
 
 , 245,
 
 736 S.E.2d 210
 
 , 213 (2012) (citations and internal quotation marks omitted) (emphasis in original) (first alteration added). In general, a person who possesses the
 

 capacity to understand and avoid a known danger
 
 and fails to take advantage of that opportunity, and [is injured as a] result[ ], ... is chargeable with contributory negligence, ... [and] [summary judgment] is proper on the theory that [the] defendant's negligence
 
 and
 
 [the] plaintiff's contributory negligence are proximate causes of the injury[.]
 

 Blue v. Canela
 
 ,
 
 139 N.C. App. 191
 
 , 193-94,
 
 532 S.E.2d 830
 
 , 832 (2000) (citation omitted) (first emphasis added).
 

 1. Plaintiff's Mental Capacity
 

 Plaintiff first argues that, because his IQ "falls into the category of mild mental retardation [,]" the ordinary standard of care does not apply in this case. Instead, Plaintiff contends, a jury must determine whether
 
 *205
 
 "[he] acted with the degree of care he [was] able to perceive based on his diminished [mental] capacity." We disagree. The record discloses insufficient evidence that Plaintiff lacked the capacity to "understand and avoid a clear danger."
 
 See
 

 Burgess v. Mattox
 
 ,
 
 260 N.C. 305
 
 , 307,
 
 132 S.E.2d 577
 
 , 578 (1963). Accordingly, we conclude Plaintiff was "subject to [the] universal rule" that "[e]very person having the capacity to exercise ordinary care for his own safety against injury is required by law to do so, and if he fail[ed] to exercise such care, and such failure ... contribute[d] to the injury complained of, he is guilty of contributory negligence."
 
 See
 

 Smith v. Fiber Controls Corp.
 
 ,
 
 300 N.C. 669
 
 , 673,
 
 268 S.E.2d 504
 
 , 507 (1980).
 

 Plaintiff overstates this Court's holding in
 
 Stacy v. Jedco Construction, Inc.
 
 ,
 
 119 N.C. App. 115
 
 ,
 
 457 S.E.2d 875
 
 (1995), which he cites for the apparent proposition that any evidence of an injured party's "diminished mental capacity"
 
 necessarily
 
 precludes summary judgment based on the affirmative defense of contributory negligence.
 
 Stacy
 
 is both factually and procedurally distinguishable from the present case. In
 
 Stacy
 
 , we considered, as a matter of first impression, "whether an adult whose mental capacity has been impaired or diminished due to
 
 advanced age, disease, or senility
 
 is capable of contributory negligence."
 
 Id.
 
 at 120,
 
 457 S.E.2d at 878-79
 
 (emphasis added). The
 
 Stacy
 
 plaintiff's intestate, who was approximately eighty-five years old when he was injured, "suffer[ed] from senile dementia, with progressively worse short term memory loss [.]"
 
 Id.
 
 at 117,
 
 457 S.E.2d at 877
 
 . Although he was repeatedly instructed not to enter a construction zone at his retirement facility, his near-total short term memory loss"made these warnings ineffective[,]" and he was subsequently injured when he entered the construction site after-hours and fell on a wooden ramp.
 
 Id.
 
 at 118,
 
 457 S.E.2d at 877
 
 . At trial, the plaintiff moved for a directed verdict on the issue of contributory negligence on the basis that "mental incompetence due to senility rendered [the plaintiff's intestate] incapable of contributory negligence."
 
 Id.
 
 at 120,
 
 457 S.E.2d at 878
 
 .
 

 On appeal, this Court held the plaintiff's motion was properly denied. We first observed that "[i]t is generally held that one who is so insane or devoid of intelligence as to be totally unable to apprehend danger and avoid exposure to it is not a responsible human agency and cannot be guilty of contributory negligence."
 
 Id.
 
 at 120,
 
 457 S.E.2d at 879
 
 (citation and internal quotation marks omitted). Our Court then concluded:
 

 However, where an injured plaintiff suffers from diminished mental capacity not amounting to insanity or total incompetence, it is a question for the trier of fact as to whether he exercised the required degree of care for his own safety, and the effect of his diminished mental faculties and capabilities may be taken into account in determining his
 
 ability to perceive and avoid a particular risk of harm
 
 . Thus, we hold that one whose mental faculties are diminished, not amounting to total insanity, is capable of contributory negligence, but is not held to the objective reasonable person standard. Rather, such a person should be held only to the exercise of such care as he was capable of exercising, i.e., the standard of care of a person of like mental capacity under similar circumstances.
 

 Id.
 

 (citations omitted) (emphasis added). Accordingly, in
 
 Stacy
 
 , this Court held the jury was properly permitted to consider the injured party's mental infirmity "in determining his ability to perceive and avoid a particular risk of harm."
 

 Id.
 

 In the present case, Plaintiff appears to argue that, under
 
 Stacy
 
 , he is generally subject to a less stringent standard of care because his low IQ constitutes a "diminished mental capacity not amounting to insanity." As an initial observation, we do not find Plaintiff's low IQ factually analogous to senility,
 
 i.e.
 
 , the "diminished mental capacity" at issue in
 
 Stacy
 
 . Additionally, we note that
 
 Stacy
 
 involved the denial of a plaintiff's motion for a directed verdict, not the allowance of a defendant's motion for summary judgment.
 
 [2]
 

 See
 

 *206
 

 Edwards v. Northwestern Bank
 
 ,
 
 53 N.C. App. 492
 
 , 495,
 
 281 S.E.2d 86
 
 , 88 (1981) (contrasting pre-trial motions for summary judgment and post-trial motions for directed verdict, and noting that "[t]he stage of the trial is different. The evidence before the court is different."). This Court's holding in
 
 Stacy
 
 does not relieve Plaintiff of his burden to forecast evidence tending to show he was unable, as a result of the specific "diminished mental capacity" he alleges, to perceive and avoid a particular risk of harm.
 

 At the hearing on Defendant's motion for summary judgment, Plaintiff's counsel told the trial court:
 

 One [issue] is that [ ] [P]laintiff's mental capacity creates a question for the jury with respect to contributory negligence. The [precedent] is [that] where an injured plaintiff suffers from diminished capacity not amounting to insanity or total incompetence [it] is a question for the trier of fact as to whether he exercised the required degree of care for his own safety and the effect [of] the diminished mental faculties and capabilities may be taken into account in determining his ability to proceed [sic] and avoid a particular risk of harm.
 

 Without getting into too much detail, Your Honor, [ ] [P]laintiff had an IQ of around 65 prior to the [16 October 2015] incident. That's in the lowest [five] percent of the population.
 

 I've cited a case here that says that is an issue for the jury to determine. Someone with [Plaintiff's] mental capacity[,] what kind of danger can he perceive? Not his parents or other eyewitnesses, but [ ] [P]laintiff himself. And that is a question for the jury.
 

 Plaintiff presented no additional evidence at the hearing in support of this argument.
 

 Counsel's mere statement that Plaintiff "had an IQ of around 65" at the time of the collision did not create an issue of fact regarding Plaintiff's ability to exercise ordinary care in the circumstances in which he was injured. Plaintiff's IQ was not itself in dispute; Defendant acknowledged at the hearing that Plaintiff "has a relatively low IQ[.]"
 
 See
 

 Charlotte-Mecklenburg Hosp. Auth. v. Talford
 
 ,
 
 366 N.C. 43
 
 , 47-48,
 
 727 S.E.2d 866
 
 , 869 (2012) (observing that, on a motion for summary judgment, non-moving party "may not rest upon the mere allegations or denials of his pleading, but ... must set forth
 
 specific facts
 
 showing that there is a genuine issue for trial." (citing N.C.G.S. § 1A-1, Rule 56(e) ) (quotation marks omitted) (emphasis added)). Moreover, this Court has explicitly held that mental impairment is not the sole measure of "[t]he ability to understand the nature of one's acts[,] [which] can be the product of multiple factors, including age, experience, or mental impairment."
 
 See
 

 Erie Ins. Exch. v. St. Stephen's Episcopal Church
 
 ,
 
 153 N.C. App. 709
 
 , 715,
 
 570 S.E.2d 763
 
 , 767 (2002) (rejecting as too narrow an interpretation of the phrase "mental capacity" to encompass only "mental retardation or other learning disorders."). Just as we have observed that "[m]erely showing that a child is bright, smart, or industrious is not enough to rebut the presumption [that children between the ages of seven and fourteen are incapable of negligence][,]" merely showing that a plaintiff has a low IQ or other intellectual disability is insufficient to establish that he should not be held to the objective reasonable person standard for purposes of contributory negligence.
 
 See
 

 Frank v. Funkhouser
 
 ,
 
 169 N.C. App. 108
 
 , 115,
 
 609 S.E.2d 788
 
 ,794 (2005) (citation omitted).
 

 Plaintiff's evidence showed that, at the time of the 16 October 2015 accident, he held a valid driver's license. He passed his driver's
 
 *207
 
 license test the first time he took the test. Plaintiff's father testified that "[Plaintiff] drove [him] everywhere[,]" and was "a very good driver." Plaintiff was permitted to drive with his younger siblings in the car without parental supervision. Plaintiff had lived on Bear Creek Road for several years, approximately one-quarter mile from the accident site, and drove that stretch of road "[e]very single day, several times a day sometimes." Plaintiff continued to drive frequently, both alone and with passengers, after recovering from the accident.
 

 Plaintiff was eighteen years old at the time of the 16 October 2015 collision. Notwithstanding the serious head injuries he sustained in the accident, he obtained his high school diploma the following spring. During his final semester in high school, Plaintiff completed an auto-mechanics internship while also working for the school's maintenance department. According to Plaintiff's father, Plaintiff had a natural aptitude for auto-mechanics, because Plaintiff "[had] been working on cars ... since he was old enough to pick up a wrench[,]" and because Plaintiff possessed "commonsense." Plaintiff planned to apply for admission to an auto-mechanics program at a local technical college.
 

 Plaintiff's father answered in the affirmative when asked whether he believed Plaintiff "underst[ood] the difference, when he's behind the wheel, between a safe and a dangerous condition on the roadway[.]" When asked whether Plaintiff "was someone who could identify a hazard or a risk, when he was driving ... in order to avoid it[,]" and whether, "even though [Plaintiff] had some challenges mentally, he knew right from wrong[,]" Plaintiff's father responded: "Yes." He indicated he agreed Plaintiff "knew danger from safety, before [the 16 October 2015] accident." Plaintiff's father also stated in a deposition: "I mean, my cousin [ ] hit a tree no bigger than that and it killed him and his brother and his wife; ...
 
 [Plaintiff] knows that
 
 ." (emphasis added).
 

 Plaintiff was unable to answer many of the questions he was asked during his deposition. However, the transcript reveals that Plaintiff's inability to answer was largely attributable to his memory loss, not an inability to understand the questions asked of him. When asked whether he had "been able to hear and understand all [of counsel's] questions so far[,]" Plaintiff responded: "Yes, ma'am." He was able to answer questions about a number of subjects unrelated to the accident, including his family life, his interest in auto-mechanics, his recreational hobbies, and his driving experience and familiarity with local roads. Plaintiff said he was working with a psychologist to "talk about me building my life[.] ... I told him I wanted to build a career."
 

 Plaintiff consistently stated he did not remember anything related to the 16 October 2015 accident, but he did indicate that, in climbing the fallen tree prior to the collision, his purpose was to warn oncoming traffic. When asked whether he thought it was safe to stand on the fallen tree in the middle of a lane of traffic, Plaintiff responded: "No." When asked whether it would have been safer to "just go around or underneath the [fallen] tree and down by the curve and wave to the traffic from there[,]" Plaintiff said: "I guess." And when asked whether he wished he had "not climbed on the [fallen] tree in the oncoming lane of traffic on Bear Creek Road on October 16th, 2015[,]" Plaintiff replied: "Do I wish I had never climbed on that tree? It's a Samaritan's job to help. ... I have helped younger and older people all my life." He further indicated he would be willing to do it again if necessary "[t]o save somebody else's life."
 

 Plaintiff's evidence also included a psychological assessment report ("Pisgah report") summarizing the results of testing conducted several weeks after the 16 October 2015 collision at the Pisgah Institute for Psychotherapy and Education ("Pisgah Institute"). Plaintiff had seen doctors at the Pisgah Institute "since he was [five] or [six] years old[,] and continue[d] to do so." Based on testing in 2010 and 2013, Plaintiff was diagnosed with Oppositional Defiant Disorder, Generalized Anxiety Disorder, and Mild Mental Retardation. Notably, the 3 November 2015 Pisgah report concluded Plaintiff no longer qualified for the diagnosis of Mild Mental Retardation.
 

 The Pisgah report found that Plaintiff's nonverbal reasoning abilities fell within the
 
 *208
 
 "[a]verage range" and were "much better developed than his verbal reasoning abilities." Plaintiff scored in the "Cognitively Impaired" range on one test that specifically found he "struggled with: visuospatial, executive, attention, language, and abstraction skills." Plaintiff's performance in broad reading, mathematics, and math calculation skills was rated "Very Low." Behaviorally, the report noted, Plaintiff struggled with "control[ling] his impulses," "acting out verbally and physically [at school] [,]" " 'not making good choices' when it comes to controlling his emotions [,]" "rule-breaking behavior[,]" "aggressive behavior[,]" and "bragging[.]" The psychologist who administered the testing made the following observations:
 

 Overall, [Plaintiff] did seem to take the testing session seriously and tried hard but seemed tired much of the time. ... He was able to report when he was done with a particular item and indicate when he did not know an answer. [Plaintiff] was able to answer all of the questions asked of him. He asked some clarifying questions before he attempted tasks but also needed many of the directions repeated on occasion. [Plaintiff] did display flexible ways to solve problems, using different strategies for different problems. [Plaintiff] was able to successfully follow multiple step directions accurately. [Plaintiff did not] seem to be distracted by the noise and activity outside or inside the testing environment. As a result of [Plaintiff's] cooperation, a minimal measure of his cognitive, academic, behavioral, adaptive, and personality functioning were obtained at this time.
 

 The report concluded that "[Plaintiff's] cognitive ability [would] need to be re-evaluated in the next few years after a full recovery from his recent head injury has occurred."
 

 Plaintiff's evidence thus showed he was an experienced driver, highly familiar with Bear Creek Road and surrounding roads.
 
 See
 
 ,
 
 e.g.
 
 ,
 
 Haskins v. Carolina Power and Light Co.
 
 ,
 
 47 N.C. App. 664
 
 , 665-66,
 
 267 S.E.2d 587
 
 , 587-88 (1980) (affirming summary judgment for defendant and finding fifteen-year-old plaintiff contributorily negligent as a matter of law, where plaintiff "
 
 was very familiar with the roadway
 
 " and, "by driving his motorbike on the defendant's roadway after dark without a light, [he] did something a reasonable [fifteen]-year-old boy would not have done under the circumstances and he should reasonably have seen that he might collide with a cable or something else on the roadway[.]" (emphasis added)). Plaintiff's low IQ did not prevent him from completing a technical internship, graduating from high school, and pursuing a career in auto-mechanics.
 
 See
 
 ,
 
 e.g.
 
 ,
 
 Welch v. Jenkins
 
 ,
 
 271 N.C. 138
 
 , 143,
 
 155 S.E.2d 763
 
 , 768 (1967) (holding fourteen-year-old boy was contributorily negligent as a matter of law where "there was no contention and no evidence tending to show [he] was lacking in the ability, capacity, or intelligence of the ordinary [fourteen]-year-old boy.
 
 On the contrary, there was evidence that before the accident he made good grades in school, [and] played basketball, baseball, and football
 
 ." (emphasis added)). Plaintiff's own testimony indicated he understood that a fallen tree obstructing a roadway posed a danger to other drivers.
 
 See
 
 ,
 
 e.g.
 
 ,
 
 Jenkins v. Lake Montonia Club
 
 ,
 
 125 N.C. App. 102
 
 , 107,
 
 479 S.E.2d 259
 
 , 263 (1997) (affirming summary judgment for defendant and finding eighteen-year-old plaintiff, who was paralyzed after diving into shallow water, was contributorily negligent as a matter of law, because he "was aware that the water beneath the [water] slide was shallow, and that if he hit his head on the bottom of the swimming area it would hurt."). Plaintiff also knew family members had died under similar circumstances. Finally, while the Pisgah report documented Plaintiff's various cognitive and behavioral challenges, nothing in it specifically suggested Plaintiff's low IQ compromised his ability to exercise due care for his own safety.
 

 We emphasize that we do not decide whether Plaintiff
 
 in fact had
 
 the "ability to perceive and avoid a particular risk of harm."
 
 See
 

 Stacy
 
 ,
 
 119 N.C. App. at 120
 
 ,
 
 457 S.E.2d at 879
 
 . We hold only that Plaintiff failed to forecast sufficient evidence tending to show that, as a result of the specific "diminished mental capacity" alleged-Plaintiff's low IQ-he could not be expected to exercise ordinary care in the circumstances that led to his injuries. Absent such showing, this argument is overruled.
 

 *209
 
 2. Failure to Yield Right of Way
 

 Plaintiff next contends that, irrespective of his mental capacity, he was not contributorily negligent "because he did not fail to yield to the right of way of other vehicles." We disagree.
 

 Our General Statutes provide that "[e]very pedestrian crossing a roadway at any point other than within a marked crosswalk ... shall yield the right-of-way to all vehicles upon the roadway."
 
 N.C. Gen. Stat. § 20-174
 
 (a) (2015). "[This] statutory duty is derived from the common law duty to use ordinary care to protect oneself from injury."
 
 Meadows v. Lawrence
 
 ,
 
 75 N.C. App. 86
 
 , 89,
 
 330 S.E.2d 47
 
 , 50 (1985). As Plaintiff notes,
 

 [o]ur courts have held that a pedestrian's failure to yield the right of way as dictated by [N.C.]G.S. [§] 20-174(a) is not contributory negligence
 
 per se
 
 , but is only evidence of negligence to be considered with other evidence in the case in determining whether the plaintiff is chargeable with negligence which proximately caused or contributed to his injury.
 

 McNeil v. Gardner
 
 ,
 
 104 N.C. App. 692
 
 , 697,
 
 411 S.E.2d 174
 
 , 176 (1991) (citation omitted). Nevertheless, "[a]lthough a violation of [N.C.]G.S. [§] 20-174(a) is not contributory negligence
 
 per se
 
 , a failure to yield the right-of-way to a motor vehicle may constitute contributory negligence as a matter of law."
 
 Meadows
 
 ,
 
 75 N.C. App. at 89
 
 ,
 
 330 S.E.2d at 49
 
 (citation omitted);
 
 see also
 

 Turpin v. Gallimore
 
 ,
 
 8 N.C. App. 553
 
 , 555,
 
 174 S.E.2d 697
 
 , 699 (1970) ("No inflexible rule can be laid down as to whether the evidence discloses contributory negligence as a matter of law, but each case must be determined upon its own particular facts." (citation omitted)). If a plaintiff-pedestrian had a duty "to yield the right-of-way [to an approaching driver] and all the evidence so clearly establishes the plaintiff-pedestrian's failure to yield the right-of-way as one of the proximate causes of his injuries that no other reasonable conclusion is possible, summary judgment should [ ] [be] entered in favor of the defendant."
 
 Gaymon v. Barbee
 
 ,
 
 52 N.C. App. 627
 
 , 628,
 
 279 S.E.2d 91
 
 , 92 (1981).
 

 Plaintiff contends the following evidence shows he did not negligently fail to yield the right of way: (1) "Plaintiff climbed onto the tree and stood on top of the tree before [ ] Defendant could be seen coming from the opposite direction[;]" (2) "There was 400 feet of sight distance in the direction from [which] [ ] Defendant [was driving][;]" and (3) "Upon seeing [ ] Defendant's vehicle coming toward him, [Plaintiff's] father yelled at [Plaintiff] to get down and [Plaintiff] attempted to jump out of the tree before he was struck." Even taking these statements as true, we find Plaintiff's argument unpersuasive.
 

 When Plaintiff and his father encountered the fallen tree, it was thickly covered with vertical branches, leaving "only [one] open spot" for Plaintiff to crawl through. Contrary to Plaintiff's contention, the mere fact that he "enter[ed] the roadway and climb[ed] the tree before he could see an oncoming vehicle" and "did not see any approaching vehicles until he was upon the tree" does not preclude a finding of contributory negligence as a matter of law.
 
 See
 
 ,
 
 e.g.
 
 ,
 
 Williams v. Davis
 
 ,
 
 157 N.C. App. 696
 
 , 698, 702,
 
 580 S.E.2d 85
 
 , 87, 89 (2003) (holding plaintiff was contributorily negligent as a matter of law, despite the fact that plaintiff "did not see any vehicular traffic in the two through lanes when he entered [an] intersection[,]" because "a reasonable person should have seen it was unsafe to enter the intersection."). Plaintiff's evidence showed he had reason to know his actions were unsafe. Plaintiff was familiar with the stretch of highway surrounding the fallen tree, which was curvy, thus reducing the distance from which Plaintiff could see an approaching vehicle. He also knew several family members had been killed in a motor vehicle that collided with a tree.
 
 See
 
 ,
 
 e.g.
 
 ,
 
 Diorio v. Penny
 
 ,
 
 103 N.C. App. 407
 
 , 409,
 
 405 S.E.2d 789
 
 , 791 (1991) ("A plaintiff who knowingly exposes herself to a risk of which she has had long-term prior notice, has a reasonable choice or option to seek to avoid that danger and fails to exercise that option, is contributorily negligent as a matter of law." (citation omitted)).
 

 Plaintiff's father testified he did not intend for Plaintiff to stand on the tree in order to direct traffic; he instructed Plaintiff "to go
 
 climb across the tree
 
 [to the other side of the
 
 *210
 
 road] and warn traffic coming about the accident." (emphasis added). However, the uncontroverted evidence-including Plaintiff's evidence-showed that, once Plaintiff climbed onto the tree, he made no further effort to cross the road. Plaintiff "never got down. He was still standing up there. He was goofing off, [being a] teenager."
 
 [3]
 
 When Plaintiff saw Defendant's vehicle rounding the curve, he started waving his arms at Defendant and "[saying things] like, 'Hey, big dummy. I'm standing here[.]' " As Defendant approached, Plaintiff "was screaming and yelling trying to get [Defendant's] attention."
 
 [4]
 
 Plaintiff continued "waving his arms at [Defendant] and [Defendant was] still just coming." Plaintiff's father testified Plaintiff was "waving, [saying] 'Hey.' You know,
 
 just being a teenager ... [b]ecause we thought [Defendant] was going to stop
 
 ."
 
 [5]
 
 (emphasis added). When asked whether Plaintiff "had time to get off the tree[,]" Plaintiff's father said: "When you're standing there waving your arms like that at somebody, you expect them to see you and start slowing down, you know. By the time I started hollering at [Plaintiff] to get down, it was too late."
 
 [6]
 

 The present case is distinguishable from cases in which pedestrians were injured while attempting to cross, actively crossing, or finishing crossing a road, and there was evidence the pedestrians had taken some safety precautions, such as looking both ways before entering the road, keeping a continual lookout, and accelerating their pace upon noticing a motorist's approach. For example, in
 
 Ragland v. Moore
 
 ,
 
 299 N.C. 360
 
 ,
 
 261 S.E.2d 666
 
 (1980), which Plaintiff cites favorably, the plaintiff-pedestrian was "over halfway across the road" when she saw the defendant's car approaching at a high speed, at which point she "started to run across the road[,]" and she "had one foot on the gravel driveway and the other on the pavement when she was struck by [the] defendant's car."
 
 Id.
 
 at 362,
 
 261 S.E.2d at
 
 667 ;
 
 see also
 

 Landini v. Steelman
 
 ,
 
 243 N.C. 146
 
 , 147,
 
 90 S.E.2d 377
 
 , 378 (1955) (holding injured pedestrian was not contributorily negligent as a matter of law, where she looked both ways before entering the roadway, was two-thirds of the way across when she noticed vehicle approaching, and "attempted to get out of its way by
 
 *211
 
 increasing [her] pace[.]");
 
 McNeil
 
 ,
 
 104 N.C. App. at 696-97
 
 ,
 
 411 S.E.2d at 176
 
 (finding plaintiff's intestate was not contributorily negligent as a matter of law where evidence showed,
 
 inter alia
 
 , intestate was wearing bright clothing and had "crossed [thirty] feet of the travel portion of the highway before she was struck by defendant's vehicle."). By contrast, Plaintiff's own evidence showed he was not actively attempting to cross the road and, further, made no immediate effort to get out of harm's way when he realized Defendant's vehicle was approaching.
 

 There was conflicting evidence about precisely where on the tree Plaintiff was standing when the collision occurred. Plaintiff's father's testimony was that Plaintiff never stood in the oncoming (
 
 i.e.
 
 , Defendant's) lane of travel. When asked to examine a photograph of the scene of the accident, Plaintiff's father stated:
 

 That limb's what hit [Plaintiff] in the back of the head. So how is it that [Plaintiff] was [allegedly] on [Defendant's] side of the yellow line and the tree limb was still on this side of the yellow line [after the collision]? ... [Plaintiff] was in this lane is what I was trying to tell you earlier, and the state trooper put it down that he was in the other lane. [Plaintiff] wasn't in the other lane. So that's another thing that the state trooper didn't get right in [the accident report] because he never talked to me about it. I wasn't there to talk to him when he showed up [at the scene of the accident]. See [the state trooper's drawing] showing [Plaintiff] in the other lane? He wasn't. He was over here in this lane.
 

 We find Plaintiff's exact location in the road immaterial. Plaintiff's father testified Plaintiff was "just to the right side" of the center yellow line. Thus, even if Plaintiff was not technically in Defendant's lane, he was standing near the middle of the road.
 
 See
 

 Kessing v. Mortgage Corp.
 
 ,
 
 278 N.C. 523
 
 , 534,
 
 180 S.E.2d 823
 
 , 830 (1971) ("[A]n issue is material if the facts alleged are such as to constitute a legal defense or are of such nature as to affect the result of the action, or if the resolution of the issue is so essential that the party against whom it is resolved may not prevail. A question of fact which is immaterial does not preclude summary judgment.").
 

 It is a basic legal tenet that the law imposes upon a person the duty to use due care to protect himself or herself from injury, and the degree of care should be commensurate with the danger to be avoided. Furthermore, it is well settled that a person is contributorily negligent if he or she knows of a dangerous condition and voluntarily goes into a place of danger.
 

 Dunbar v. City of Lumberton
 
 ,
 
 105 N.C. App. 701
 
 , 703,
 
 414 S.E.2d 387
 
 , 388 (1992) (citations omitted). In light of the clear safety risks associated with standing on a fallen tree that was largely obscured by branches and obstructing both lanes of traffic on a curvy mountain road, along with the fact that Plaintiff knew family members had died in similar circumstances but nevertheless made no immediate effort to leave the roadway, we conclude Plaintiff's failure to yield the right of way amounted to contributory negligence as a matter of law. Plaintiff's negligence was a proximate cause of his injuries.
 
 See
 

 Williamson v. Liptzin
 
 ,
 
 141 N.C. App. 1
 
 , 10,
 
 539 S.E.2d 313
 
 , 319 (2000) (defining proximate cause as "a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred, and one from which a person of ordinary prudence could have reasonably foreseen that such a result,
 
 or consequences of a generally injurious nature
 
 , was probable under all the facts as they existed." (citation omitted) (emphasis added)).
 

 Other issues of fact in the record relate to the existence and extent of negligence by Defendant. However, because Plaintiff's forecast of evidence establishes contributory negligence as a matter of law, we need not address Defendant's negligence.
 
 See
 

 Sawyer v. Food Lion, Inc.
 
 ,
 
 144 N.C. App. 398
 
 , 401,
 
 549 S.E.2d 867
 
 , 869 (2001) ("In North Carolina, if an issue of contributory negligence is raised as an affirmative defense, and proved, it completely bars [a] plaintiff's recovery for injuries resulting from [the] defendant's negligence." (citation omitted)).
 

 *212
 
 B. Last Clear Chance
 

 Plaintiff argues in the alternative that, even if he was contributorily negligent, genuine issues of material fact exist as to whether Defendant had the last clear chance to avoid striking Plaintiff. "Last clear chance is a plea in avoidance to the affirmative defense of contributory negligence[.]"
 
 Vernon v. Crist
 
 ,
 
 291 N.C. 646
 
 , 650,
 
 231 S.E.2d 591
 
 , 593 (1977). Our Supreme Court has articulated the doctrine of last clear chance as follows:
 

 Where an injured pedestrian who has been guilty of contributory negligence invokes the last clear chance or discovered peril doctrine against the driver of a motor vehicle which struck and injured him, he must establish these four elements: (1) That the pedestrian negligently placed himself in a position of peril from which he could not escape by the exercise of reasonable care; (2) that the motorist knew, or by the exercise of reasonable care could have discovered, the pedestrian's perilous position and his incapacity to escape from it before the endangered pedestrian suffered injury at his hands; (3) that the motorist had the time and means to avoid injury to the endangered pedestrian by the exercise of reasonable care after he discovered, or should have discovered, the pedestrian's perilous position and his incapacity to escape from it; and (4) that the motorist negligently failed to use the available time and means to avoid injury to the endangered pedestrian, and for that reason struck and injured him.
 

 VanCamp v. Burgner
 
 ,
 
 328 N.C. 495
 
 , 498,
 
 402 S.E.2d 375
 
 , 376-77 (1991) (citation and quotation marks omitted). "The issue of last clear chance [m]ust be submitted to the jury if the evidence, when viewed in the
 
 light most favorable to the plaintiff
 
 , will support a reasonable inference of each essential element of the doctrine."
 
 Scheffer v. Dalton
 
 ,
 
 243 N.C. App. 548
 
 ,
 
 777 S.E.2d 534
 
 , 542 (2015) (citation and internal quotation marks omitted) (alteration and emphasis in original). "[U]nless
 
 all the necessary elements
 
 of the doctrine are present, the case is governed by the ordinary rules of negligence and contributory negligence."
 
 Culler v. Hamlett
 
 ,
 
 148 N.C. App. 372
 
 , 379,
 
 559 S.E.2d 195
 
 , 200 (2002) (citation omitted) (emphasis added). In the present case, the evidence did not show Plaintiff placed himself in a position of peril "from which he could not escape[,]" and, by extension, Plaintiff cannot show Defendant knew or should have known of Plaintiff's "incapacity to escape."
 
 See
 

 Davis v. Hulsing Enterprises, LLC
 
 , --- N.C. App. ----, ----,
 
 783 S.E.2d 765
 
 , 773 (2016).
 

 Plaintiff was required to forecast evidence showing not only that Defendant "owed [him] a duty to keep a reasonable and proper lookout in the direction of travel, [but] also, that if [D]efendant had fulfilled that duty, he would have discovered [P]laintiff's
 
 helpless peril
 
 in time to avoid injuring him by then exercising reasonable care."
 
 Sink v. Sumrell
 
 ,
 
 41 N.C. App. 242
 
 , 249,
 
 254 S.E.2d 665
 
 , 670 (1979) (emphasis added);
 
 see also
 

 Exum v. Boyles
 
 ,
 
 272 N.C. 567
 
 , 577,
 
 158 S.E.2d 845
 
 , 854 (1968) (noting that "to invoke the doctrine of the last clear chance[,] the plaintiff must plead it and the burden of proof is upon him." (citations omitted)). "A plaintiff is in a position of helpless peril when that plaintiff's prior contributory negligence has placed her in a position from which she is
 
 powerless to extricate herself
 
 ."
 
 Outlaw v. Johnson
 
 ,
 
 190 N.C. App. 233
 
 , 238,
 
 660 S.E.2d 550
 
 , 556 (2008) (citation and internal quotation marks omitted) (emphasis added);
 
 see also
 

 Trantham v. Estate of Sorrells
 
 ,
 
 121 N.C. App. 611
 
 , 614,
 
 468 S.E.2d 401
 
 , 403 (1996) (holding proper inquiry is whether negligent plaintiff was "in helpless peril [at the time]
 
 immediately before the accident
 
 which results in her injury[.]" (emphasis in original)).
 

 This Court has held that "[t]he last clear chance doctrine is [ ] inapplicable where the injured party is at all times in control of the danger and simply chooses to take the risk."
 
 See
 

 Williams v. Odell
 
 ,
 
 90 N.C. App. 699
 
 , 704,
 
 370 S.E.2d 62
 
 , 66 (1988) ;
 
 see also
 

 Clodfelter v. Carroll
 
 ,
 
 261 N.C. 630
 
 , 635-36,
 
 135 S.E.2d 636
 
 , 639 (1964). For example, in
 
 Stephens v. Mann
 
 ,
 
 50 N.C. App. 133
 
 ,
 
 272 S.E.2d 771
 
 (1980), we held the plaintiff did not place herself in a position of "helpless peril" when she climbed into the back of a pickup truck loaded with unsecured furniture and was injured when the defendant began driving the truck:
 

 *213
 
 Although [the] plaintiff may have placed herself in a dangerous position, danger alone is not the equivalent of helpless peril. The evidence [in
 
 Stephens
 
 did] not support a conclusion that once [the] plaintiff entered the loaded truck and it began moving, she could do nothing to protect herself or was inadvertent to her precarious position.
 

 Id.
 
 at 137,
 
 272 S.E.2d at 773
 
 . Similarly, in
 
 Culler
 
 , we concluded the plaintiff's evidence failed to show she was in helpless peril where, despite knowing an
 

 [oncoming] vehicle was steadily approaching, [the] plaintiff chose to ignore the dangers from which she had the power to extricate herself. When asked ... if there was anything that prevented her from running or stepping quickly [as she crossed the road] ... she responded, 'No, other than I didn't think I needed to run[.]'
 

 148 N.C. App. at 380
 
 ,
 
 559 S.E.2d at 201
 
 .
 

 In the present case, Plaintiff's own evidence-including evidence presented to show Defendant had "ample time and distance" to avoid striking the tree-suggested Plaintiff's presence in the tree was not a position from which he was "powerless to extricate himself."
 
 See
 

 Nealy v. Green
 
 ,
 
 139 N.C. App. 500
 
 , 505,
 
 534 S.E.2d 240
 
 , 244 (2000). It is undisputed that Plaintiff was facing Defendant's lane of traffic while standing in the tree, and continued standing there, waving and yelling, even after seeing Defendant's vehicle approaching.
 
 Compare with
 

 Privett v. Yarborough
 
 ,
 
 166 N.C. App. 664
 
 , 667,
 
 603 S.E.2d 579
 
 , 581 (2004) ("[E]vidence tending to show the injured pedestrian either was not facing oncoming traffic or did not see the approaching vehicle has been found sufficient to satisfy [the helpless peril requirement], our courts reasoning that the pedestrian who did not apprehend imminent danger could not reasonably have been expected to act to avoid injury." (citation and quotation marks omitted));
 
 Williams v. Spell
 
 ,
 
 51 N.C. App. 134
 
 , 136,
 
 275 S.E.2d 282
 
 , 284 (1981) (finding decedent-pedestrian "placed himself in a position of helpless peril by walking on the roadway with the flow of traffic, that is, with his back to traffic.").
 

 While standing on the tree, Plaintiff was "goofing off, [being a] teenager." Plaintiff's father testified they could "hear[ ] [Defendant's] [truck] pipes bellowing out the whole way up the hill[.]" According to Plaintiff, after rounding the curve in the road, "Defendant had [four to five] seconds and 400 feet in which to see [ ] Plaintiff and the tree in the roadway,
 
 giving him ... time and distance to avoid crashing into ... the tree
 
 ." (emphasis added). When Plaintiff saw Defendant's vehicle approaching, however, he did not immediately attempt to get out of the way-not for lack of opportunity, but because he "thought [Defendant] was going to stop."
 
 See
 
 ,
 
 e.g.
 
 ,
 
 Asbury v. City of Raleigh
 
 ,
 
 48 N.C. App. 56
 
 , 63,
 
 268 S.E.2d 562
 
 , 566 (1980) (finding that, when defendant bus driver "was 172 feet from the point of impact[,] ... decedent [-bicyclist] was still not in peril and could, by the exercise of reasonable vigilance, have extricated himself from possible danger."). On these facts, we cannot conclude Plaintiff's position was "one of true helplessness[.]"
 
 See
 

 Williams v. Odell
 
 ,
 
 90 N.C. App. at 704
 
 ,
 
 370 S.E.2d at 66
 
 . Accordingly, the doctrine of last clear chance is inapplicable.
 

 IV.
 
 Conclusion
 

 Because we conclude Plaintiff was contributorily negligent as a matter of law, and the doctrine of last clear chance is unavailing in this case, we affirm the trial court's order granting summary judgment for Defendant.
 

 AFFIRMED.
 

 Judges DIETZ and BERGER concur.
 

 [1]
 

 Plaintiff filed an amended complaint on 6 January 2016, adding as a second defendant one of the owners of the real property from which the tree fell, but that defendant was subsequently dismissed from this action.
 

 [2]
 

 In
 
 Hawley v. Cash
 
 ,
 
 155 N.C. App 580
 
 ,
 
 574 S.E.2d 684
 
 (2002), this Court observed the case
 

 [was] unusual in that [the]
 
 plaintiff
 
 made the motion for [a] directed verdict on [the] defendants' defense of contributory negligence at the close of all the evidence at trial. In most cases that set out the applicable standard of review, the defendant moves for a directed verdict on its affirmative defense that the plaintiff is barred from recovery as a result of [the] plaintiff's contributory negligence. Thus, the evidence viewed in the light most favorable to the non-moving party[ ] is normally viewed in the light most favorable to the plaintiff. Here, however, the evidence must be considered in the light most favorable to [the] defendants, since [the] plaintiff was the moving party. Therefore, if there is more than a scintilla of evidence supporting each element of [the] [defendants'] claim that [the] plaintiff was contributorily negligent, then the issue should have been submitted for the jury to decide.
 

 Id.
 
 at 583,
 
 574 S.E.2d at 686
 
 (emphasis in original) (internal quotation marks omitted).
 

 [3]
 

 Eyewitness Evelyn May ("Ms. May"), one of the owners of the real property from which the tree fell, gave similar statements during a deposition. For example, Plaintiff's counsel asked: "Did you see [Plaintiff] climb up along the [tree] trunk, or did you see him just climb up once and stand and stay in the same spot?" Ms. May replied: "[Plaintiff] just climbed up and stood there." When asked whether Plaintiff "[w]as [ ] starting to try and get down from the tree when he was hit[,]" Ms. May responded: "[N]o. [Plaintiff] was not trying to get down. He was standing on the tree." Ms. May also observed that Plaintiff acted "excited" and appeared to think the fallen tree was "cool."
 

 [4]
 

 Consistent with Plaintiff's father's account, eyewitness Wendy Andrei, who was driving east on Bear Creek Road just prior to the collision, stated in an affidavit that she saw Plaintiff standing on top of the tree and that, when "[a] truck came around the corner from the other direction[,] ... [Plaintiff] began waving his arms at [the] truck. It was apparent ... that [Plaintiff] was trying to draw attention to himself so that [Defendant] would see him."
 

 [5]
 

 Ms. May made similar observations about Plaintiff's conduct while he was standing on the tree. Prior to the collision, Ms. May saw Plaintiff "go toward the tree in an excitable manner ... [like] it was cool." She stated in her deposition: "[Plaintiff] was [acting like] an excited kid climbing a tree that was in the middle of the road[.] ... I just got the impression that [Plaintiff] just got excited and wasn't thinking." Ms. May later elaborated that Plaintiff's "actions denoted an excited kid[,] ... [such as] [g]etting out of the car, ignoring his father ['s] [instructions to direct traffic][,] ... [and] the arm-waving thing [,] [as if to say] 'Look at me.' "
 
 See
 

 Cozart v. Chapin
 
 ,
 
 39 N.C. App. 503
 
 , 507,
 
 251 S.E.2d 682
 
 , 685 (1979) ("On motion for judgment as of nonsuit, ... [a]ll the evidence must be considered in the light most favorable to [the] plaintiff, giving him the benefit of every fact and inference of fact pertaining to the issues, which may be reasonably deducted from the evidence.
 
 Defendant's evidence may be considered to the extent that it is not in conflict with [the] plaintiff's evidence and tends to make clear or explain [the] plaintiff's evidence
 
 ." (citations omitted) (emphasis added)).
 

 [6]
 

 Plaintiff's father contradicted himself at various times during his deposition about whether Plaintiff ever in fact tried to jump down from the tree prior to the collision. However, even resolving these contradictions in Plaintiff's favor (
 
 i.e.
 
 , even assuming Plaintiff made a last-ditch effort to jump down), the evidence consistently showed that,
 
 even after realizing Defendant's vehicle was approaching
 
 , Plaintiff did not
 
 immediately
 
 try to get out of Defendant's way; rather, he remained in the same spot on the tree and tried to alert Defendant by waving his arms and yelling.